**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gabriel Jesse ARCHULETA, a/k/a Vinnie, Defendant-Appellant.**

No. 16-1297

United States Court of Appeals, Tenth Circuit.

FILED July 28, 2017

Josh R. Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, and Ryan K. Melcher, Assistant Federal Public Defender, on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

J. Bishop Grewell, Assistant United States Attorney (Robert C. Troyer, Acting United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

Before BRISCOE, SEYMOUR, and McHUGH, Circuit Judges.

BRISCOE, Circuit Judge.

Defendant Gabriel Archuleta pleaded guilty to three criminal counts: specifically,

violations of 18 U.S.C. §§ 371, 924(c)(1)(A)(ii), and 2113(a) and (d). All of these charges arose out of Archuleta's participation in an armed bank robbery and his subsequent agreement to engage in additional armed bank robberies. Archuleta was sentenced to concurrent terms of 120 months' imprisonment on the § 371 and § 2113 convictions, plus a consecutive 84-month sentence on the § 924(c) conviction, for a total term of imprisonment of 204 months. Archuleta now appeals his sentence, arguing that the district court erred in (1) imposing a four-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(A) for "abduction," (2) assigning him a criminal history point for a Colorado state conviction for marijuana possession, and (3) imposing a sentence above the statutory maximum for the § 371 conviction. Exercising jurisdiction pursuant to 28 U.S.C. §1291, we reject Archuleta's first argument, but conclude that there is merit to his second and third arguments. Consequently, we remand to the district court with directions to vacate Archuleta's sentence and resentence him.

## I

On the afternoon of June 17, 2014, two armed men wearing masks and gloves entered the lobby of the Wells Fargo Bank in Wheat Ridge, Colorado, and ordered the employees and customers to get down on the floor. The men then ordered the tellers to come out from the teller area. One of the men also demanded that the bank manager come forward and give them access to the bank's vault. The manager complied and said that she could give the robber access to the vault. The robber said he was aware that it would take two people to open the vault, so he directed the manager and one teller, at gunpoint, to take him to the vault area of the bank. The manager and teller complied and, together with the robber, they left the lobby area and entered the bank's vault. There, the robber, again at gunpoint, directed the manager to open the safe and place the money from the safe into a black plastic trash bag. The manager complied, but the robber expressed frustration that she was not moving quick enough and cycled the slide on his handgun, pointed it directly at the manager, and ordered her to move faster.

While the one robber was in the vault, the other robber maintained control over the remaining employees and customers in the bank's lobby by ordering them at gunpoint to lie on the floor. When new customers entered the bank, the robber also ordered them to get down on the floor. This robber walked continuously around the area, maintaining control over the employees and customers, while telling the robber in the vault to hurry up.

After the manager had placed most of the money from the vault into the trash bag, the robber in the vault took the trash bag with the money and left the vault area. The two robbers then fled the bank and got into a Honda Element that was waiting in the bank's parking lot. The Honda Element, which had been stolen a few days earlier from a home in south Denver, was driven by a third individual. A witness observed the Honda Element leave the bank parking lot and head southbound. Not long after the robbers fled the bank, the Honda Element was found engulfed in flames in a wooded area less than five miles from the bank.

The Federal Bureau of Investigation (FBI) found no useful forensic evidence at the scene of the robbery. But the FBI did discover that a woman who worked as a teller at another Wells Fargo branch in the Denver area had conspired with the robbers. Specifically, the woman provided the robbers with information about Wells Fargo's general procedures for gaining access to a vault, and also with information

about how to determine which Wells Fargo branch would have large amounts of cash on hand at a particular time. In exchange for this information, the robbers provided her with a portion of the robbery proceeds.

The two robbers were identified as Gabriel Archuleta and Thomas McQuown. The FBI determined that shortly after the robbery, Archuleta spent large sums of money, often $100 bills, on a variety of items including clothing, jewelry and automobiles. The FBI also monitored and recorded phone calls between Archuleta and the female teller who had conspired with him.

In February of 2015, McQuown told his female coconspirator that he was in need of cash and was considering committing additional robberies. At the suggestion of the FBI, the female coconspirator told McQuown to hold off because she might have some ideas for him. The female coconspirator then, at the suggestion of the FBI, arranged for McQuown and Archuleta to meet with an undercover FBI agent posing as an employee of an armored car company. The purported purpose of the meeting was to discuss a possible robbery.

The undercover FBI agent met with Archuleta and discussed setting up a robbery. The agent advised Archuleta that he would know when large deposits would be made at a given bank and could contact Archuleta so that he and McQuown could rob the bank immediately following a large deposit. Two days later, the undercover FBI agent met with Archuleta again and provided him with a cell phone to use for further communications.

The undercover agent subsequently met with both Archuleta and McQuown to further discuss the planned robbery. The three men discussed a general plan in which the undercover agent, acting in the course of his alleged employment as an armored car driver, would drop money at a bank and then Archuleta and McQuown would shortly thereafter enter the bank at gunpoint and steal the money before bank personnel had the opportunity to place it in the vault.

The undercover agent met with Archuleta and McQuown two more times. The last of these meetings, which was audio and video recorded by the undercover agent, was for the purpose of casing banks for potential robbery. During this meeting, the undercover agent drove Archuleta and McQuown to two suburban Denver banks where they surveilled the exteriors of these banks. The undercover agent also provided Archuleta and McQuown with sketches of the interiors of both banks. Archuleta discussed possible escape routes from both banks, and Archuleta and McQuown devised a code that the undercover agent could text them to identify which of the two banks would have the most money. McQuown also provided the undercover agent with a separate code to use if the money deposited at the target banks was not sufficient to justify the robbery.

Archuleta was arrested on March 18, 2015. Archuleta waived his rights and agreed to be interviewed. He admitted to committing the June 17, 2014, bank robbery and conspiring to commit an additional bank robbery in March 2015. With respect to his role in the June 17, 2014, bank robbery, Archuleta admitted that he was one of the two men who entered the bank, and that he was the one who ordered and accompanied the bank manager and a teller into the vault. He also identified the driver of the getaway vehicle as Thomas Lucero.

## II

On March 23, 2015, a federal grand jury indicted Archuleta, McQuown and Lucero on four criminal counts: (1) conspiracy to commit bank robbery in 2014, in violation

of 18 U.S.C. § 371; (2) armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d); (3) brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and (4) conspiracy to commit bank robbery in 2015, in violation of 18 U.S.C. § 371.

On March 13, 2016, Archuleta entered a plea of guilty, pursuant to a written plea agreement, to Counts 2, 3, and 4 of the indictment. In exchange for Archuleta's plea, the government agreed to dismiss Count 1 of the indictment and to recommend a sentence within the advisory sentencing guideline range.

A presentence investigation report (PSR) was prepared and submitted to the district court and the parties on May 26, 2016. In calculating Archuleta's total offense level, the PSR applied a base offense level of 20 for the armed bank robbery, and then applied three enhancements, including a four-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(A), "because a person was abducted to facilitate the commission of the offense." ROA, Vol. 2 at 29. In support, the PSR noted that "[t]he defendants directed the manager and the teller at gunpoint to move to the vault area of the bank." Id. Ultimately, the PSR recommended an adjusted offense level of 31 for the armed bank robbery. After grouping the offenses and applying two reductions for acceptance of responsibility, the PSR arrived at a total offense level of 28. With respect to Archuleta's criminal history, the PSR noted that Archuleta had two Colorado state juvenile criminal convictions, one in March 2013 for "1st Degree Trespass-Auto-With Intent to Commit a Crime," and another in July 2013 for "Possession of Marihuana Under 1 Ounce" in Adams County (Colorado) Combined Court. Id. at 31. The PSR assigned one criminal history point for each of those convictions, resulting in a "subtotal criminal history score of two." Id. at 32. The PSR also added two criminal points because Archuleta "committed the instant offense while under a criminal justice sentence" in connection with the first degree trespass conviction. Id. That resulted in a total criminal history score of four and a criminal history category of III. Based upon the total offense level of 28 and the criminal history category of III, the PSR recommended an advisory Guidelines sentencing range of 97 to 121 months.

Archuleta objected to the PSR's proposed four-level enhancement pursuant to U.S.S.G. § 2B1.3(b)(4)(A) for abduction. More specifically, Archuleta argued that "none of the people in the bank were forced to accompany any of the defendant's [sic] to 'a different location,' nor was there any type of hostage situation or attempt to isolate the victims." Id. at 129. Archuleta also objected to the PSR's assignment of one criminal history point for his juvenile conviction for marijuana possession. In support, Archuleta argued that the conviction was for "a Class 2 Petty Offense" and that he appeared pro se in connection with those criminal proceedings. Id. at 130. Archuleta also argued that a "conviction for possessing a small amount of marijuana [wa]s excluded from criminal history points pursuant to [U.S.S.G.] § 4A1.2(c) [sic]." Id.

The district court held a sentencing hearing on July 7, 2016. The district court rejected Archuleta's objection to the four-level enhancement for abduction:

The defendant has objected to paragraph 32 [of the PSR] with respect to the four-level increase and argues that none of the people were forced to accompany the defendant to a different location. There are cases that show even within the same building that constitutes abduction, and that's an appropriate increase. That objection is overruled.

Abduction means that a victim was forced to accompany an offender to a

different location. That certainly happened here.

ROA, Vol. 3 at 49. The district court also overruled Archuleta's objection to the assessment of one criminal history point for his juvenile conviction for marijuana possession. With regard to the marijuana charge, the district court acknowledged that Archuleta "was appearing pro se," but also noted that "[a]t one time he was represented in that case ... by a deputy public defender." Id. at 50-51. Thus, the district court adopted the PSR's sentencing calculations, i.e., a total offense level of 28 and a criminal history category of III. The district court "f[ou]nd no reason in this case to depart or vary from the advisory sentencing guideline range." Id. at 59. Ultimately, the district court sentenced Archuleta to concurrent 120-month sentences for Counts 2 and 4, and an 84-month consecutive sentence for Count 3, resulting in a total term of imprisonment of 204 months. The district court also sentenced Archuleta to a five-year term of supervised release.

### III

*The four-level enhancement for abduction*

■ In his first issue on appeal, Archuleta argues that the district court erred in applying a four-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(A) for Archuleta having "abducted" bank employees. In reviewing a district court's application of the Sentencing Guidelines, we review legal questions, including interpretation of a particular Guideline, de novo, and review any underlying factual findings for clear error. United States v. Craig, 808 F.3d 1249, 1255 (10th Cir. 2015).

Section 2B3.1 applies to cases, like Archuleta's, that involve robbery convictions. Subsection (a) begins by directing a district court to impose a base offense level of 20 to any such conviction. U.S.S.G. § 2B3.1(a). Subsection (b), entitled "Specific Offense Characteristics," in turn outlines a number of different enhancements that may be applied depending upon the particular circumstances of the case at issue. Of relevance here, subsection (b)(4)(A) directs that "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape, increase by 4 levels." Id. § 2B3.1(b)(4)(A). Application Note 1 to § 2B3.1 states that the term "abducted" is "defined in the Commentary to § 1B1.1." Id. cmt. n.1. In turn, Application Note 1 to § 1B1.1 states that the term " '[a]bducted' means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." U.S.S.G. § 1B1.1, cmt. n.1(A).

■ With these definitions in mind, we must decide a question of first impression in this circuit, i.e., whether the forced movement of victims from one room or area to another room or area within the same building constitutes an abduction for purposes of § 2B3.1(b)(4)(A). Notably, five other circuits have addressed the question, and there is a split of authority.

On the one hand, the Third, Fourth and Fifth Circuits have all held that an abduction occurs for purposes of § 2B3.1(b)(4)(A) when a defendant forces a victim from one room or area of a building to another room or area within the same building. For its part, the Third Circuit has identified "three predicates that must be met before the abduction enhancement can be applied." United States v. Reynos, 680 F.3d 283, 286 (3d Cir. 2012). These include:.

First, the robbery victims must be forced to move from their original position; such force being sufficient to permit a reasonable person an inference that he or she is not at liberty to refuse.

Second, the victims must accompany the offender to that new location. Third, the relocation of the robbery victims must have been to further either the commission of the crime or the offender's escape.

Id. at 286-87 (footnote omitted). Applying this three-part test, the Third Circuit has concluded that an abduction occurred where a robber, wielding a pistol, forced pizza shop employees from the restaurant bathroom where they were hiding to the cash register area of the restaurant, a distance of approximately thirty-four feet, so that they could assist him in opening the cash register. Id. at 291.

The Fourth Circuit applies a "flexible, case by case approach to determining when movement 'to a different location' has occurred." United States v. Osborne, 514 F.3d 377, 390 (4th Cir. 2008). Under that approach, the Fourth Circuit has held "that movement within the confines of a single building can constitute movement 'to a different location.'" Id. at 389-90. Consequently, it concluded that an abduction occurred where a robber moved employees of a Walgreens store "from the pharmacy section (through its secured door), across the store area (on a winding course through its aisles), to the front door of the Walgreens building." Id. at 390. In reaching this conclusion, the court stated: "it is in ordinary parlance to say that the pharmacy section and the store area [we]re 'different locations' within the Walgreens building ... in view of the fact that the pharmacy section and the store area [we]re divided by a counter, as well as a secured door intended to be passable only by authorized persons via keypad." Id. Lastly, the court noted that the defendant's purpose in doing so was to "keep[ ] victims close by as readily accessible hostages." Id.

Lastly, the Fifth Circuit, like the Fourth Circuit, has "indicated that the term 'different location' should be interpreted with flexibility." United States v. Buck, 847 F.3d 267, 277 (5th Cir. 2017). The Fifth Circuit has also "repeatedly construed the 'abduction' enhancement as applicable when a victim is forced from one part of a building to another." Id. In particular, the Fifth Circuit has repeatedly held, in the context of bank robbery cases, that the abduction enhancement is applicable if the robber or robbers move bank employees from one location to another within the bank. E.g., United States v. Smith, 822 F.3d 755, 763-64 (5th Cir. 2016) (holding that abduction occurred where "bank robbers forcefully moved various bank employees to different locations within the banks (e.g., the bank vaults) to aid in stealing money during the course of the bank robberies"); United States v. Bonner, 575 Fed.Appx. 250, 251 (5th Cir. 2014) (unpublished) (applying enhancement where bank robbers moved bank manager from the floor of the bank to the bank vault, then from the bank vault to his office, then back to the bank vault); United States v. Holiday, 582 Fed.Appx. 551, 552 (5th Cir. 2014) (unpublished) (holding that enhancement was applicable where three armed bank robbers forced the bank manager and another employee to lie on the ground and then to get up and enter the adjoining cash room a few steps away to open the safe).

On the other hand, the Seventh and Eleventh Circuits have reached different conclusions. In United States v. Eubanks, 593 F.3d 645, 654 (7th Cir. 2010), the Seventh Circuit addressed two robberies committed by the same defendants. In the first, one of defendant Eubanks' co-defendants "forced an employee to the back of [a] beauty supply store to retrieve a surveillance video." Id. at 652. In the second, Eubanks dragged a jewelry store employee "less than six feet" within the store. Id. The Seventh Circuit concluded that "[u]n-

der these facts, and taking into account the physical dimensions of the structures at issue, transporting the victims from one room to another [wa]s simply not enough for abduction." Id. at 654. The Seventh Circuit stated in closing that "[w]hile there may well be situations in which an abduction enhancement is proper even though the victim remained within a single building, those facts are not present here." Id.

On at least two occasions, the Seventh Circuit has held that forcing a bank or credit union employee at gunpoint to enter the bank or credit union's building from an adjacent parking lot constitutes an abduction.[1] United States v. Taylor, 128 F.3d 1105, 1110-11 (7th Cir. 1997) (bank employee); United States v. Davis, 48 F.3d 277, 279 (7th Cir. 1995) (credit union employee). The Seventh Circuit has also affirmed the imposition of a two-level enhancement pursuant to § 2B3.1(b)(4)(B) for "physical restraint" where a robber forced a bank teller at gunpoint from the bank vault to the location of her teller's drawer against her will.[2] In doing so, the Seventh Circuit did not address the question of whether these facts would have justified the § 2B3.1(b)(4)(A) enhancement for abduction.

As for the Eleventh Circuit, it has held that a bank branch is a single location and that, consequently, movement of victims within a bank branch to individual offices or rooms does not constitute movement to a different location for the purposes of § 2B1.3(b)(4)(A). United States v. Whatley, 719 F.3d 1206, 1221-23 (11th Cir. 2013). In the Eleventh Circuit's view, such facts more appropriately implicate the two-level enhancement for physical restraint of victims outlined in § 2B3.1(b)(4)(B). Id.

Considering all of these cases together, what appears to divide the circuits is a difference of opinion regarding the meaning of the term "location." As noted, § 1B1.1 defines the term "abducted" to mean "that a victim was forced to accompany an offender to a different location." U.S.S.G. § 1B1.1, cmt. n.1(A). Because the term "location" is not defined in the Guidelines, we must rely on the accepted rules of statutory construction in defining the term. See United States v. Nacchio, 573 F.3d 1062, 1066 (10th Cir. 2009) ("We interpret the Sentencing Guidelines according to accepted rules of statutory construction."). One of the most basic of those rules is to accord statutory language its plain meaning. See United States v. Porter, 745 F.3d 1035, 1041-42 (10th Cir. 2014); United States v. Marrufo, 661 F.3d 1204, 1207 (10th Cir. 2011) ("When a term is not defined in the Guidelines, we give it its plain meaning."). The term "location" is commonly defined to mean "[a] particular place or position," Oxford English Dictionary (online ed. 2017), and "[t]he specific place or position of a person or thing," Black's Law Dictionary (10th ed. 2014). Although the term "place" is sometimes interpreted to refer to "[a] building or area used for a specific purpose or activity," Oxford English Dictionary (online ed. 2017), the term "position" appears to be more narrowly confined to the precise place or spot where a person or thing is located at a single moment in time,[3] see

---

1. Under the dissent's proposed test, this would not qualify as "abduction" because the victims were forced to enter, rather than leave, the banks. See Dissent at 1295 ("if a person robs a bank, he 'abducts' a victim by forcing the victim to leave the bank.").

2. U.S.S.G. § 2B3.1(b)(4)(B) calls for a two-level enhancement "if any person was physi-

cally restrained to facilitate commission of the offense or to facilitate escape."

3. Archuleta argues that the single example contained in § 1B1.1's definition of "abducted," i.e., "a bank robber's forcing a bank teller from the bank into a getaway car," U.S.S.G. § 1B1.1, cmt. n.1(A), indicates that "the guidelines contemplate movement be-

Oxford English Dictionary (online ed. 2017) (defining "position" as "[a] place where someone or something is located or has been put.").

In our view, the Third Circuit's decision in <u>Reynos</u> is the most consistent with these definitions. Specifically, in outlining its requirements for application of the abduction enhancement, the Third Circuit requires proof that "the robbery victims [were] forced to move from their original <u>position</u>." 680 F.3d at 286-87 (emphasis added). In other words, the Third Circuit does not require proof that the victims were forced to move in or out of a particular building, and instead simply requires proof that the victims were forced by the defendant to move from one position to another.[4] That said, the Third Circuit also adheres to the language of the Guidelines by requiring proof that the victims accompanied the defendant "to the new location" and that the relocation of the victims was intended to either further the commission of the crime or the defendant's escape. <u>Id.</u> at 287.

We therefore adopt the Third Circuit's interpretation of the abduction enhancement, as well as its three-part test for proof of abduction. For purposes of U.S.S.G. § 2B3.1(b)(4)(A), a person is "abducted" if (1) he or she is forced to move from his or her original position with sufficient force that a reasonable person would not believe he or she was at liberty to refuse; (2) the offender accompanies the person to the new location; and (3) the relocation of the person was in order to further either the commission of the crime or the offender's escape.[5] Applying that three-part test to the undisputed facts presented here, we readily conclude that Archuleta did, in fact, abduct two of the bank employees. To begin with, it is undisputed that Archuleta, by brandishing a firearm, forced the bank manager and a female teller to accompany him from the lobby and teller area of the bank around a corner and into a separate vault area. Further, it is undisputed that this movement was intended by Archuleta to further the

---

yond a single building or area to trigger the [abduction] enhancement." Aplt. Br. at 10. The problem with this argument is that it essentially ignores the meaning of the term "location." Archuleta also points to the definition of abduction contained in Black's Law Dictionary, which he says states "that abduction may be loosely defined as kidnapping." <u>Id.</u> The problem with this argument is that § 1B1.1 expressly defines the term "abducted," and thus it would be improper for us to adopt an alternate and broader dictionary definition of the term.

4. In <u>Whatley</u>, the Eleventh Circuit concluded that "[a]lthough the term 'different location' could be interpreted at many different levels of generality," "[t]he ordinary meaning of the term 'different location' would not apply to each individual office or room in a local branch of a bank." 719 F.3d at 1222. In so concluding, however, the Eleventh Circuit did not rely on, or even cite to, a dictionary definition of the term "location." Instead, it

appears to have simply applied its own understanding of the term.

The dissent in this case essentially does the same thing, concluding, without citation to any authority, that "the common sense meaning of 'different location' is anywhere in the world that is not the place just robbed." Dissent at 1293. Moreover, the problem with the dissent's position is that it limits the sentencing court's options when conduct on the part of a defendant exceeds simply restraining a victim, so long as that conduct occurs within the confines of "the place just robbed." <u>Id.</u>

5. The dissent states that, in light of our opinion, "the only way a person could receive an enhancement for physical restraint while not being eligible for an abduction enhancement is if all of his victims remain perfectly still throughout the entire robbery." Dissent at 1294. This is incorrect because it ignores the requirements of our three-pronged test. Under that test, it is quite clear that victims can make physical movements without the abduction enhancement being implicated.

commission of the bank robbery. More specifically, Archuleta was familiar with Wells Fargo's operating procedures and knew that two employees were needed to access the vault. Archuleta also used the bank manager to place money from the safe into a plastic trash bag. We therefore conclude that the district court properly applied the four-level abduction enhancement pursuant to § 2B3.1(b)(4)(A).

*Assessment of one criminal history point for juvenile marijuana possession*

In his second issue on appeal, Archuleta argues that the district court erred in assessing him one criminal history point for his Colorado state conviction for marijuana possession. The conviction that Archuleta refers to arose out of conduct on July 2, 2013, when he was age seventeen. ROA, Vol. 2 at 31 (PSR at 10). He was originally charged in Colorado state court with "Synthetic Cannabinoids–Possession/Use," id. at 32 (PSR at 11), but the charge was ultimately amended, and Archuleta pleaded guilty, to "Possession of Marihuana Under 1 Ounce,"[6] id. at 31. The PSR states that Archuleta was "[o]rdered to pay costs and fees totaling $161." Id. at 32.

The PSR assigned Archuleta one criminal history point for this conviction, citing U.S.S.G. § 4A1.2(d)(2)(B). Archuleta objected to the PSR's assignment of one point for this conviction. To begin with, Archuleta asserted that, at the time he pleaded guilty to the offense, he was appearing pro se. Further, Archuleta asserted that the records from the conviction "reflect[ed] that [his] offense was a Class 2 Petty Offense," and that, under Colorado law, the penalty for such offenses "is a fine only, up to $100." ROA, Vol. 1 at 83. "Under these circumstances," Archuleta argued, "the prior conviction . . . should

not receive any criminal history points." Id. at 84. More specifically, he argued that "[c]ertain offenses, including possession of small amounts of marijuana, are excluded from being assessed criminal history points" under U.S.S.G. § 4A1.2(c). Id. In addition, he argued that "[t]he fact that one cannot be imprisoned and that the maximum $100 fine is so low for possessing less than one ounce of marijuana is a common sense indicator that the offense is among the least serious offenses recognized in the criminal code." Id. at 86. The offense also, Archuleta argued, "b[ore] similar characteristics to public intoxication and [was] far less dangerous than activities such as careless or reckless driving, speeding, resisting arrest, [and] disorderly conduct." Id.

The probation officer proposed rejecting these objections on the grounds that Archuleta's conviction "[wa]s not an offense similar to any offense noted in § 4A1.2(c)" and because, "[a]ccording to criminal records, [Archuleta] was represented by a deputy public defender at some point during the proceedings of the case." ROA, Vol. 2 at 131. At sentencing, the district court summarily overruled Archuleta's objections and adopted the PSR's proposed assignment of one criminal history point for the conviction.

On appeal, Archuleta argues that his conviction for marijuana possession should not have been assigned any criminal points. In support, he asserts that "[i]n Colorado, where [he] was convicted, an adult age 21 or older lawfully can possess up to an ounce of marijuana," yet "[t]he same behavior was illegal for [him] at the time because of his status as a juvenile." Aplt. Br. at 17. "Therefore," he asserts, the offense "was a juvenile status offense,

---

**6.** Nothing in the record on appeal, including the PSR, identifies the precise Colorado statute that Archuleta was convicted of violating.

Presumably, the conviction arose under Colo. Rev. Stat. § 18-133-122(3)(b).

which is listed in U.S.S.G. § 4A1.2(c)(2) as an offense that does not count toward a defendant's criminal-history calculation." Id.

■ Because Archuleta did not raise this argument in the district court, it is subject to review only for plain error. See United States v. Wireman, 849 F.3d 956, 962 (10th Cir. 2017). "We will find plain error only when there is '(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Wireman, 849 F.3d at 962 (quoting United States v. Marquez, 833 F.3d 1217, 1221 (10th Cir. 2016)).

Section 4A1.2 of the Guidelines is entitled "Definitions and Instructions for Computing Criminal History." Subsection (c)(2) thereof states, in pertinent part:

> Sentences for all felony offenses are counted. Sentences for misdemeanor and petty offenses are counted, except as follows:
>
> * * *
>
> (2) Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are never counted:
>
> Fish and game violations
> Hitchhiking
> Juvenile status offenses and truancy
> Local ordinance violations (except those violations that are also violations under state criminal law)
> Loitering
> Minor traffic infractions (e.g., speeding)
> Public intoxication
> Vagrancy.

U.S.S.G. § 4A1.2(c)(2).

The Commentary to § 4A1.2(c) states, in pertinent part:

> In determining whether an unlisted offense is similar to an offense listed in subsection ... (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishment imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

Id. cmt. n.12(A).

■ As noted, Archuleta argues that his marijuana possession conviction was a juvenile status offense and thus should not have been assigned any criminal history points. The government does not seriously dispute this point, and, in any event, he appears to be correct. Other circuits have held "that to qualify as a juvenile status offense, an offense must be (1) committed by a person younger than eighteen years of age, (2) involve conduct that would be lawful if engaged in by an adult, and (3) be non-serious in nature." United States v. Landa, 642 F.3d 833, 838 (9th Cir. 2011); see also United States v. Webb, 218 F.3d 877, 880 (8th Cir. 2000); United States v. Correa, 114 F.3d 314, 318-19 (1st Cir. 1997); United States v. Ward, 71 F.3d 262, 263 (7th Cir.1995). Applying those requirements to the facts presented here, it is undisputed that Archuleta's offense conduct occurred when he was seventeen years old. Further, it appears to be undisputed that Archuleta's conduct, i.e., possession of less than one ounce of marijuana, involved conduct that, under Colorado law, would have been lawful if engaged in by a person over the age of twenty-one. Lastly, the conduct appears to be non-serious in nature. To begin with, the conviction appears to have arisen under a statute that makes it illegal for juveniles to possess and consume both alcohol and marijuana. Further, the penalty imposed

for the crime, i.e., a small monetary fine, indicates that the Colorado legislature does not view the offense as serious. Moreover, the offense did not involve any violent conduct or conduct that otherwise posed a risk of harm to any other person or object. In sum, there appears to be little, if any, question that Archuleta's conviction was a juvenile status offense. Thus, by assigning Archuleta's conviction a criminal history point, the district court committed an error that is plain, given the language of § 4A1.2(c)(2) and the case law interpreting it.

■■■ That leads to the third and fourth prongs of the plain error test. "In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." Molina-Martinez v. United States, ——— U.S. ———, 136 S.Ct. 1338, 1346, 194 L.Ed.2d 444 (2016); see also United States v. Sabillon-Umana, 772 F.3d 1328, 1334 (10th Cir. 2014) (cited, with approval, in Molina-Martinez). But "[t]he sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it." Molina-Martinez, 136 S.Ct. at 1346. "The Government remains free to 'poin[t] to parts of the record'—including relevant statements by the judge—'to counter any ostensible showing of prejudice the defendant may make.'" Id. at 1347 (quoting United States v. Vonn, 535 U. S. 55, 68, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002)); see also Sabillon-Umana, 772 F.3d at 1334. ("[T]he record [might] reveal a 'fortuitous comment' from the sentencing judge making clear that its error in applying the guidelines didn't adversely affect the defendant's ultimate sentence."). For example, if the sentencing "judge based the sentence he or she selected on factors independent of the Guidelines," then an improperly calculated Guidelines range

might not have prejudiced the defendant. Molina-Martinez, 136 S.Ct. at 1346-47 (2016).

■■■ In this case, the government "agrees that the one point" assigned by the district court for this conviction raised Archuleta's total criminal history points from three to four, and in turn raised his criminal history category from II to III. Aple. Br. at 24. The government also agrees that, ultimately, this increased Archuleta's advisory Guidelines sentencing range from 87 to 108 months to 97 to 121 months. Id. at 25. These circumstances are sufficient to indicate that "there is at least a reasonable probability that the District Court would have imposed a different sentence had it known" that the Guidelines range should have been lower. See Molina-Martinez, 136 S.Ct. at 1348.

The government attempts to rebut Archuleta's showing of prejudice with statements made by the sentencing judge. It asserts that the district "court clarified that it would give the same sentence to Archuleta if the Guideline were changed by the one point" by stating, "'Quite frankly, the one-point difference [in criminal history points] would not change my view.'" Id. (quoting ROA, Vol. 3 at 66). The district court continued: "In this particular instance, given the danger that was imposed upon these people [in the bank by Archuleta] and the life-long suffering that they're going to have, the guidelines kept me from imposing a more severe sentence." ROA, Vol. 3 at 66.

These statements are not sufficient to overcome Archuleta's showing of prejudice. The sentencing judge did not indicate that the sentence was imposed without regard to the calculated Guidelines range. In fact, to the contrary, he indicated that he felt constrained by the calculated range when he indicated that "the guidelines kept [him] from imposing a more severe

sentence." Further, nothing in the record indicated that the sentencing judge was aware that the single criminal history point in dispute would have changed the recommended Guidelines sentencing range from the calculated 97 to 121 months, down to the correct range of 87 to 108 months. And nothing in the record indicates that the judge would have been willing to vary upward from that correctly calculated range in order to impose the sentence given of 120 months on each Count 2 and Count 4. Thus, the district court's statements do not change our conclusion that Archuleta has demonstrated a reasonable probability that he would have received a lesser sentence if the district court had imposed a sentence based on the correct Guidelines range. Archuleta's substantial rights were affected by the district court's error.

Further, when "a court clearly miscalculates the advisory guidelines range ... a defendant's substantial rights and the integrity of the judicial process are surely at risk" because "the benchmark for the entire sentencing process rests on an obviously mistaken premise." Sabillon-Umana, 772 F.3d at 1334. Archuleta is entitled to relief on this claim in the form of a remand for resentencing.

*The sentence imposed for the § 371 conviction*

In his third and final issue on appeal, Archuleta argues that the district court erroneously sentenced him to a term of imprisonment of 120 months for his conspiracy conviction under 18 U.S.C. § 371 (Count 4 of the indictment). In support, Archuleta notes that the statutory maximum penalty for such a conviction is 60 months' imprisonment. Because Archuleta did not raise this argument below, we review it only for plain error. See Wireman, 849 F.3d at 962.

Section 371 of Title 18 provides, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do not act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371 (emphasis added). Thus, as asserted by Archuleta, the statutory maximum sentence that could be imposed by the district court for his conspiracy conviction was five years.

We need not address in detail each of the prongs of the plain error test because, under Tenth Circuit case law, a sentence that exceeds the statutory maximum "trigger[s] per se, reversible, plain error." United States v. Gonzalez-Huerta, 403 F.3d 727, 739 n.10 (10th Cir. 2005) (en banc). Admirably, the government concedes this point and agrees that "this case should be remanded so that a sentence of no more than five years is imposed on Count IV." Aple. Br. at 26.

IV

The case is REMANDED to the district court with directions to vacate Archuleta's sentence and resentence him consistent with this opinion.

SEYMOUR, Circuit Judge, concurring in part and dissenting in part.

I join the majority except to the extent it upholds the four-level enhancement for abduction. The majority not only reaches the wrong conclusion considering the facts of this case but it also adopts an incoherent test for determining whether a person qualifies for the abduction enhancement under U.S.S.G. § 2B3.1(b)(4)(A).

Section 2B3.1 of the sentencing guidelines concerns the crime of robbery, assigning a base offense level of 20 to persons convicted of robbery under either 18 U.S.C. §§ 1951, 2113, 2114, 2118(a), or 2119. U.S.S.G. § 2B3.1(a). The rest of § 2B3.1 details the many sentencing enhancements for committing certain acts during the commission of a robbery, such as discharging a firearm, § 2B3.1(b)(2)(A), or causing "bodily injury," § 2B3.1(b)(3)(A).

The enhancement at issue in this case comes from § 2B3.1(b)(4), which reads as follows:

(A) If any person was abducted to facilitate commission of the offense or to facilitate escape, increase by 4 levels; or (B) if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels.

The terms "abducted" and "physically restrained" are defined in the Application Notes of § 1B1.1 as follows:

(A) "Abducted" means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction.

\* \* \*

(K) "Physically restrained" means the forcible restraint of the victim such as by being tied, bound, or locked up.

I agree with the majority that "what appears to divide the circuits is a difference of opinion regarding the meaning of the term 'location.'" Maj. Op. at 1287. Or, more specifically, at what level of abstraction should a court define the term location? For instance, if a person were standing behind three people in the cashier's line in the lobby of a bank and the bank was located in Dallas, Texas, what is that person's location? Fourth in line? The lobby of a bank? A bank? Dallas? Texas? The

United States of America? Technically, all fall within the definition of location, which, as the majority notes, is defined as "[a] particular place or position." *Id.* at 1287 (quoting Oxford English Dictionary (online ed. 2017)). But we are tasked with deciding what the guidelines mean when it uses the undefined term "different location" in the definition of "abducted," and I think the majority defines the term too narrowly.

First, the guidelines provide an example of what level of abstraction to use when determining if a person has forced his victim to a different location when it defines abduction: "a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." U.S.S.G. § 1B1.1, cmt. n.1(A). The bank as a whole is treated as the location in the sole example given in the guideline definition of abduction. This example illustrates that the level of abstraction for the definition of location envisioned by the guidelines is much broader than the majority's definition. *See United States v. Whatley*, 719 F.3d 1206, 1222 (11th Cir. 2013) ("The ordinary meaning of the term 'different location' would not apply to each individual office or room in a local branch of a bank. Instead, the bank would be treated as a single location, as it is in the example provided by the guidelines in which an abduction occurs when an employee is taken from a bank to a getaway car to facilitate the bank robber's escape."). Moreover, this case concerns § 2B3.1, which is a provision dealing exclusively with robbery. In this context, the common sense meaning of "different location" is anywhere in the world that is not the place just robbed.

Finally, the majority's definition of "abducted" blurs the distinction between it and the enhancement for physical restraint. We have defined physical restraint as follows:

For purposes of this enhancement, "[p]hysical restraint is not limited to physical touching of the victim. Rather, physical restraint occurs whenever a victim is specifically prevented at gunpoint from moving, thereby facilitating the crime. *Keeping someone from doing something* is inherent within the concept of restraint...." [*United States v. Fisher*, 132 F.3d 1327,] 1329-30 [ (10th Cir. 1997) ] (citations omitted). Thus, "we have determined an enhancement for physical restraint is applicable when the defendant uses force, *including force by gun point*, to impede others from interfering with commission of the offense." *United States v. Pearson*, 211 F.3d 524, 525-26 (10th Cir.2000) (emphasis added). *United States v. Miera*, 539 F.3d 1232, 1234 (10th Cir. 2008). Compare this to the majority's definition of "abducted":

> For purposes of U.S.S.G. § 2B3.1(b)(4)(A), a person is "abducted" if (1) he or she is *forced to move from his or her original position* with sufficient force that a reasonable person would not believe he or she was at liberty to refuse; (2) *the offender accompanies the person to the new location*; and (3) the relocation of the person was in order to further either the commission of the crime or the offender's escape.

Maj. Op. at 1288 (emphasis added). The majority reaches this conclusion after noting that

> [t]he term "location" is commonly defined to mean "[a] particular place or position," Oxford English Dictionary (online ed. 2017), and "[t]he specific place or position of a person or thing," Black's Law Dictionary (10th ed. 2014). Although the term "place" is sometimes interpreted to refer to "[a] building or area used for a specific purpose or activity," Oxford English Dictionary (online ed. 2017), *the term "position" appears to be more narrowly confined to the precise place or spot where a person or thing is located at a single moment in time,* see Oxford English Dictionary (online ed. 2017) (defining "position" as "[a] place where someone or something is located or has been put.").

*Id.* at 1287–88 (emphasis added) (footnote omitted).

According to the majority, the term location means a "particular position," and the term position means a person's "precise spot." Next, the majority encompasses this definition of position in the dispositive element of its abduction test by stating that any forced movement from one's "original position" (i.e., one's precise spot) will satisfy the test's first element. And the first element is doing all the heavy lifting in the majority's test because it is hard to imagine a scenario where an armed robber would allow his victims to move freely about the crime scene after forcing them at gunpoint to move. The majority's second element, that the offender must accompany the victim to their new spot, is almost meaningless because there is no distance standard. The third element, that the movement of the victim was to further the commission of the crime or the offender's escape, is strikingly similar to this circuit's test for physical restraint: "an enhancement for physical restraint is applicable when the defendant uses force ... to impede others from interfering with commission of the offense." *Miera*, 539 F.3d at 1234 (quoting *Pearson*, 211 F.3d at 525-26). With no distance requirement in its first element, and two other elements that add very little to the inquiry, the majority's "flexible standard" is in fact standardless. Accordingly, it appears that the only way a person could receive an enhancement for physical restraint while not being eligible for an abduction enhancement is if all of his victims remain perfectly still throughout the entire robbery. This is an absurd result.

The term "different location" can obviously be "broad enough to encompass different points of reference within the constructs of a single building or geographic site," like shopping malls, office buildings, and apartment complexes. *United States v. Reynos*, 680 F.3d 283, 293 (3d Cir. 2012) (Ambro, J., dissenting). But the majority's conclusion that any movement from one's "original position" (presumably a single step in any direction) constitutes a "different location" obscures the distinction between the enhancements for "abduction" and "physical restraint." And obviously the Sentencing Commission intended a significant distinction, because the physical restraint enhancement is only a two-level increase while the abduction enhancement is four. § 2B3.1(b)(4).

I am persuaded the guideline draws a clear line: if a person robs a bank, he "abducts" a victim by forcing the victim to leave the bank.[1] This definition avoids any overlap between abduction and physical restraint, is much easier for courts to apply, and is consistent with the level of abstraction given in the only example provided in the definition of abduction in § 1B1.1, cmt. n.1(A).[2] Respectfully, I dissent.

---

1. The majority mischaracterizes this test by claiming that two Seventh Circuit cases, *United States v. Taylor*, 128 F.3d 1105, 1110-11 (7th Cir. 1997) and *United States v. Davis*, 48 F.3d 277, 279 (7th Cir. 1995), where robbers escorted employees from a parking lot into a bank and a credit union, would have turned out differently under this test. That is incorrect. Under this test, the parking lot would constitute the original location and moving outside the parking lot would constitute a different location, and thus, abduction.

2. The majority claims that the problem with my position is that it "limits the sentencing court's options when conduct on the part of a defendant exceeds simply restraining a victim, so long as that conduct occurs within the confines of 'the place just robbed.' " Maj. Op. at 1288 n.4 (quoting Dissent at 1293). That is not the problem with my position; that is the point. "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation [or Sentencing Commission Guidelines] in accord with their own conceptions of prudent public policy." *United States v. Rutherford*, 442 U.S. 544, 555, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).