FILED
United States Court of Appeals
Tenth Circuit

July 6, 2022

Christopher M. Wolpert
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 20-1228 |
| DAVID SIDNEY WELLS, | |
| Defendant - Appellant. | |

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. NO. 1:19-CR-00160-REB-JMC-1)**

---

Ty Gee (Jenny Braun with him on the briefs), Haddon, Morgan and Foreman, P.C., Denver, Colorado, for Defendant-Appellant.

Jeffrey K. Graves, Assistant U.S. Attorney (Jason R. Dunn, United States Attorney, with him on the brief), Durango, Colorado, for Plaintiff-Appellee.

---

Before **MATHESON**, **MURPHY**, and **MORITZ**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

David Wells brutally assaulted his wife, V.W.  A grand jury issued an indictment charging Wells with committing: (1) aggravated sexual abuse in "Indian country,"[1] in violation of 18 U.S.C. §§ 2241(a)(1) and 1153; (2) assault with the intent to commit aggravated sexual abuse in Indian country, in violation of 18 U.S.C. §§ 113(a)(1) and 1153; (3) assault resulting in serious bodily injury in Indian country, in violation of 18 U.S.C. §§ 113(a)(6) and 1153; and (4) assault with a dangerous weapon in Indian country, in violation of 18 U.S.C. §§ 113(a)(3) and 1153.  After a petit jury convicted Wells on all four counts, the district court sentenced him to a lengthy term of incarceration.  Wells appeals, challenging his convictions and sentence.  None of Wells's challenges to his conviction are meritorious.  At sentencing, however, the district court erred in adjusting upward Wells's total offense level on the basis Wells obstructed justice when he violated

---

[1]The terms "Indian" and "Indian county" are used in the United States Code to denote, inter alia, important jurisdictional concepts.  For instance, Wells's prosecution took place in federal court pursuant to the terms of 18 U.S.C. § 1153, titled "Offenses committed within Indian country."  Section 1153(a) provides that "[a]ny Indian who commits against the person or property of another Indian or other person any of [a series of listed offenses], shall be subject to the same law and penalties as all other persons committing any of [the listed offenses] within the exclusive jurisdiction of the United States."  For this reason alone, we use the terms "Indian" and "Indian country" in this opinion.  The record reveals both Wells and V.W. are Indians and the attack took place within the boundaries of the Ute Mountain Ute Indian Reservation.  *See* 18 U.S.C. § 1151 ("Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government").

-2-

an order directing that he have no contact with V.W.  *See* U.S.S.G. § 3C1.1.

Accordingly, this court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and 18

U.S.C. § 3742(a) and **remands** the matter to the district court for the narrow

purpose of vacating Wells's sentence and conducting any further necessary

proceeding with regard to the § 3C1.1 obstruction-of-justice adjustment.

## II.  GENERAL BACKGROUND[2]

Wells and V.W. are married and considered "Indians" under federal law.

*See supra* n.1.  On March 9, 2019, Wells and V.W. were alone at Wells's house

on the Ute Mountain Ute Indian Reservation.  Wells accused V.W. of being

pregnant by another man.  Frightened, V.W. told Wells she wanted to leave.

Wells responded: "get the fuck out of my house, bitch."  When V.W. tried to flee

through the kitchen, Wells tackled her in the doorway.  Wells dragged V.W. by

her hair through the kitchen and into a back bedroom filled with children's toys

(the "toy room").  Wells told V.W. she "wasn't leaving, and that he was going to

kill [her]."  Once in the toy room, V.W. broke free from Wells and, again, tried to

escape through the kitchen door.  Wells caught her and, for a second time,

dragged her by her hair through the kitchen to the toy room.  This same pattern of

events then repeated for a third time.

---

[2]Set out herein is a general factual recitation of the events directly surrounding Wells's assault on V.W.  Any additional facts necessary to provide context to the issues raised by Wells on appeal are set out more fully below.

During V.W.'s third escape attempt, Wells retrieved a wooden "club" from the kitchen.[3]  Once secluded in the toy room with V.W., Wells struck her repeatedly with the club, telling her "[she] wasn't making it out of there walking or alive."  Wells beat V.W.'s head and legs with the club until she was bloody. The beating caused V.W. to suffer intense pain.  Wells eventually pushed V.W. onto the floor of the toy room.  Wells then repeatedly kicked V.W. in the stomach, telling her if there was "any chance [she] was pregnant that the baby would be dead."  As V.W. lay on the floor, bloody and beaten, Wells ripped off her pants.  He attempted to shove the wooden club inside her vagina, asking if "that's how it felt" when she was with her "little boyfriend."  Next, Wells inserted his fingers into V.W.'s vagina.  Finally, Wells climbed on top of V.W., placed his hands around her neck, and said "[h]e was going to kill [her]."  V.W. eventually lost consciousness.

After an unknown amount of time, V.W. awoke on the floor of the toy room in a pool of her own blood, naked from the waist down.  V.W. dressed, washed the blood from her face, walked to a neighbor's house, and called the police.  A Bureau of Indian Affairs ("BIA") officer responded to the call.  The officer immediately noticed injuries to V.W. and called an ambulance.  V.W. told the

---

[3]The record reveals that the "club" was a "large decorative fork, approximately the length of a forearm." Wells broke off the top portion of the fork to create a wooden club.

-4-

officer Wells "beat her up" using a wooden object.  V.W. testified she did not report the sexual abuse at that time because "it was too shameful."  An ambulance took V.W. to a hospital in Cortez, Colorado.  The BIA officer found Wells at a nearby residence.  Wells tried to hide in a bedroom and gave a false name.  His shorts and shoes were covered in blood and he had noticeably swollen knuckles.  Later that day, while being driven to Shiprock, New Mexico, for medical clearance, Wells said "I fucked up. . . .  I'm sorry, I didn't mean to do that."

A BIA Special Agent spoke to V.W. at the hospital.  V.W. described Wells's attack consistently with her trial testimony, but again omitted Wells's acts of sexual abuse because of shame.  Due to the severity of V.W.'s injuries, doctors cut the interview short to life-flight V.W. to St. Anthony's Hospital in Lakewood, Colorado.  Upon her arrival at St. Anthony's, V.W. was examined by Dr. Rebecca Vogel, a trauma surgeon.  V.W. told Vogel her injuries were the result of the attack by Wells and said she "hurt all over."  Vogel noted the existence of numerous traumatic injuries, including bruising, swelling, and bleeding all over V.W.'s body.  A CAT scan of V.W.'s face revealed a broken orbital bone with bone fragments and blood in her sinus cavity.  A scan of V.W.'s abdomen and pelvis showed "a lot of inflammation as well as some blood in the area and swelling" in the duodenum.  Vogel admitted V.W. to the hospital's intensive care unit.  V.W. remained at the hospital for three days, undergoing "[c]ontinued

examinations of her abdomen, as well as ensuring that she could tolerate food and water and drinking." V.W. consented to an exam by a qualified sexual assault nurse examiner. The nurse documented a host of injuries, including a 1.5-centimeter laceration on V.W.'s labia minora consistent with blunt force trauma inflicted at the time of Wells's attack.

A federal grand jury issued a four-count indictment charging Wells with aggravated sexual abuse, assault with the intent to commit aggravated sexual abuse, assault resulting in serious bodily injury, and assault with a dangerous weapon. *See supra* Section I (setting out the charges against Wells). Following a jury trial, Wells was convicted on all four counts. During sentencing proceedings, the district court concluded Wells's advisory guidelines range under the United States Sentencing Guidelines was a term of life imprisonment. Despite labeling Wells a "habitual violent domestic abuser" whose criminal history was "substantially understated and underrepresented" by the advisory guidelines range, the district court varied downward to a sentence of 360 months' imprisonment after analyzing the factors set out in 18 U.S.C. § 3553(a).

### III.  ANALYSIS

### A.  Challenges to Convictions

#### 1.  Waived/Invited Claims of Error

Wells argues that the district court erred in instructing the jury on the elements of the §§ 2241(a)(1) and 113(a)(1) charges.  Wells invited both of these alleged instructional errors and has, therefore, waived appellate review of the propriety of both instructions.

#### a.  § 2241(a)(1) Instruction

Section 2241(a)(1) prohibits "knowingly caus[ing] another person to engage in a sexual act[] by using force against that other person."  Prior to trial, the parties submitted to the court a package of stipulated jury instructions.  R. Vol. I at 204-41.[4]  As relevant here, stipulated Instruction No. 9 provided as follows:

> To find defendant guilty of this crime, the government must prove each of the following five (5) essential elements beyond a reasonable doubt:
>
> *First*: that defendant caused [V.W.] to engage in a sexual act; and,
>
> *Second*: that defendant acted knowingly in causing [V.W.] to engage in the sexual act; and,

---

[4]Not only did this package include sixteen instructions to which the parties stipulated, it also contained competing jury instructions upon which the parties could not agree and a single non-stipulated, non-competing instruction submitted by Wells.

*Third*: that defendant did so by using force against [V.W.]; and,

*Fourth*: that defendant is an Indian under federal law; and,

*Fifth*: that the act occurred within the exterior boundaries of the Ute Mountain Ute Indian Reservation.

R. Vol. I at 222. Immediately prior to the formal charging conference, the district court noted it would not take long to review the proposed jury instructions "[b]ecause many of the instructions are, in fact, stipulated." R. Vol. VIII at 679. The district court did note, however, that the stipulated instructions "may be slightly massaged or tweaked by the Court." *Id.* During the formal charging conference, the district court inquired whether either party had any objections to proposed Instruction No. 12, the district court's version of the parties' stipulated Instruction No. 9, and both defense counsel and the government disclaimed any objection. Thus, with only the most trivial stylistic changes, the district court provided to the jury the parties' stipulated elements instruction.

For the first time on appeal, Wells asserts the district court committed plain error in misinstructing the jury as to the essential elements of a § 2241(a) charge. According to Wells, the district court should have instructed the jury that not only did the government have to prove that Wells acted knowingly in causing V.W. to engage in a sexual act, but also that he did so by knowingly using force. Because Wells invited the alleged error, he has waived appellate review. "Under the

invited error doctrine, this [c]ourt will not engage in appellate review when a defendant has waived his right to challenge a jury instruction by affirmatively approving it at trial. A party that has *forfeited* a right by failing to make a proper objection may obtain relief for plain error; but a party that has *waived* a right is not entitled to appellate relief." *United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012) (quotation and alteration omitted).

Wells claims he did not waive his asserted instructional error because the record does not demonstrate that his attorney affirmatively stipulated to the jury instruction. *See* Wells's Reply Br. at 20-21 (asserting that the stipulated package of instructions "is not a stipulation. Mr. Wells's lawyer did not sign it; only the government did"). This argument borders on bad faith. All the record evidence indicates the parties entered into a stipulation as to the relevant instruction. The prosecutor so attested in a filing in the district court.[5] The stipulated package of instructions submitted by the prosecutor also sets out specific non-stipulated instructions being requested by Wells, some of which the prosecution contested and one of which the prosecutor neither stipulated to nor contested. At no point did Wells file any document or raise any objection to the prosecutor's assertion

---

[5]Given the arguments set out in Wells's reply brief, a member of this panel specifically asked Wells's appellate counsel whether he was asserting the prosecutor lied to the district court when he submitted the stipulated package of jury instructions. Wells's appellate counsel affirmatively stated he was not accusing the prosecutor of lying.

the parties had reached a stipulation as to the elements instruction for the

§ 2241(a)(1) charge.  Immediately before the charge conference, Wells did not

correct the district court when it noted the parties had reached a stipulation as to

the bulk of the necessary instructions.  In light of all this, we have no doubt

Wells's trial counsel stipulated to the § 2241(a)(1) elements charge, thereby

waiving appellate review of the instruction.

Alternatively, Wells asserts that because the district court made trivial

stylistic edits to the stipulated instruction, he cannot be said to have stipulated to

the § 2241 elements instruction actually given by the district court.  This

argument, too, is frivolous.

> The invited-error doctrine prevents a party who induces an erroneous
> ruling from being able to have it set aside on appeal.  It is based on
> reliance interests similar to those that support the doctrines of
> equitable and promissory estoppel.  Having induced the court to rely
> on a particular erroneous proposition of law or fact, a party may not
> at a later stage use the error to set aside the immediate consequences
> of the error.

*United States v. Jereb*, 882 F.3d 1325, 1338 (10th Cir. 2018) (quotations,

citations, and alteration omitted).  Wells's complaint about Instruction No. 12 has

nothing to do with the verbiage of the district court's stylistic changes to the

parties' stipulated instruction.  Instead it relates specifically to the failure of

Instruction No. 12 to apply, allegedly in error, the intent element set out in

§ 2241(a)(1) to both the causing-of-the-victim-to-engage-in-a-sexual-act element

-10-

and the using-force element. That alleged error was directly induced by the parties' stipulated instruction. Having led the district court into the error he now identifies on appeal, Wells has affirmatively waived appellate review.

### b. § 113(a)(1) Instruction

Section 113(a)(1) prohibits assault "with intent to commit . . . a violation of section 2241." Instruction No. 13 told the jury that to find Wells guilty of violating § 113(a)(1), it had to find beyond a reasonable doubt the existence of the following non-jurisdictional elements: "*First*: that defendant knowingly assaulted [V.W.]; and *Second*: that defendant assaulted [V.W.] with the specific intent to commit aggravated sexual abuse." R. Vol. I at 360. The instruction further provided that the term "'Aggravated sexual abuse' means the offense charge[d] in Count 1" of the indictment. *Id.* As noted above, Count 1 of the indictment charged a substantive violation of § 2241(a)(1).

For the first time on appeal, Wells asserts Instruction No. 13 misinformed the jury because it does not specifically state that to find him guilty of the § 113(a)(1) charge, the jury had to find he had the specific intent to undertake every element of § 2241(a)(1). Wells has waived appellate review of this issue by inviting the alleged error. Instruction No. 13 is, in all material respects, identical to the stipulated elements instruction, proposed Instruction No. 10, submitted by the parties. For the same reasons set out above in concluding Wells waived

-11-

appellate review of his challenge to Instruction No. 12, he has also waived appellate review of Instruction No. 13.

## 2. Forfeited Claims of Error

Wells raises two additional challenges to his conviction on the § 113(a)(1) charge—(1) his convictions under §§ 113(a)(1) and 2241(a)(1) are multiplicitous and (2) § 113(a)(1) is unconstitutionally vague.  He separately asserts the district court erred in admitting testimony from Vogel regarding the risk of death to V.W. resulting from Wells's assault upon V.W.  Because Wells did not raise these issues before the district court, and because he did not affirmatively waive them, he is entitled to relief on appeal if he can satisfy the rigorous plain error standard. *See United States v. Courtney*, 816 F.3d 681, 683 (10th Cir. 2016).  The burden of establishing the existence of plain error is a heavy one not often satisfied.  *See United States v. Crowe*, 735 F.3d 1229, 1242 (10th Cir. 2013).  Under the plain error standard, a defendant must establish "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright*, 848 F.3d 1274, 1278 (10th Cir. 2017) (quotation and citations omitted).  "An error is plain if it is clear or obvious under current, well-settled law.  In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th

-12-

Cir. 2012) (quotation and citation omitted); *see also United States v. Finnesy*, 953 F.3d 675, 696-97 (10th Cir. 2020) (emphasizing the rigorousness of the plainness prong of the plain error test).

### a. Entry of Judgment on the § 113(a)(1) Count

Wells claims the district court erred in failing to, sua sponte, set aside his conviction for violating § 113(a)(1). According to Wells, (1) his § 113(a)(1) and § 2241(a)(1) convictions are multiplicitous, and (2) § 113(a)(1) is so incomprehensible that a conviction thereunder violates due process. Wells has failed to demonstrate the existence of a plain error as to either of these arguments.

### i. Multiplicity

Multiplicity occurs when two separate criminal counts cover the same criminal behavior. *United States v. McCollough*, 457 F.3d 1150, 1162 (10th Cir. 2006). "Multiplicity is not fatal to an indictment. Indeed, the government may submit multiplicitous charges to the jury. But multiplicitous sentences violate the Double Jeopardy Clause, so if a defendant is convicted of both charges, the district court must vacate one of the convictions." *United States v. Frierson*, 698 F.3d 1267, 1269 (10th Cir. 2012) (quotations and citations omitted).[6] "If 'the

---

[6]To be precise,

Multiplicitous sentences are not wholly proscribed; if multiple counts for which a defendant is convicted cover the same criminal behavior, our review is limited to whether Congress intended multiple

(continued...)

-13-

same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Based on the arguments presented by Wells on appeal, this court cannot conclude the district court plainly erred in failing to, sua sponte, vacate his § 113(a)(1) conviction. Count 1 of the indictment, which charges a violation of § 2241(a)(1), requires proof (1) force was employed (2) to knowingly cause a sex act. *United States v. Martin*, 528 F.3d 746, 752 (10th Cir. 2008). Count 2 of the indictment, which charges a violation of § 113(a)(1), requires neither the

---

[6](...continued)
convictions and sentences under the statutes. We presume that where two statutory provisions proscribe the same offense, a legislature does not intend to impose two punishments for that offense. However, this presumption is not controlling if "there is a clear indication of contrary legislative intent."

*United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013) (quoting *Missouri v. Hunter*, 459 U.S. 359, 367 (1983) (other quotations and citations omitted)). On plain error review, it is Wells's burden to demonstrate the existence of a plain error. As to this particular claim of error, *Benoit* clearly demonstrates that to prevail on any claimed double jeopardy violation, Wells must demonstrate not only multiplicity, but also that there is no clear indication Congress intended to impose two punishments for the same offense. *Id.* Notably, Wells does not even attempt to carry this burden. This failure does not ultimately matter, however, because Wells has failed to demonstrate the § 2241(a)(1) and § 113(a)(1) convictions are plainly multiplicitous.

application of force nor a resulting sex act. Instead, a § 113(a)(1) charge requires proof of an assault with specific intent to violate § 2241. Wells asserts the existence of multiplicity by conflating assault and force. These terms are not the same, however, and an assault under § 113(a)(1) will not necessarily satisfy the force requirement in § 2241(a)(1). *Compare United States v. Cates*, 973 F.3d 742, 745-46 (7th Cir. 2020) ("[F]orce in § 2241(a)(1) is the exertion of physical power upon another to overcome that individual's will to resist." (quotation omitted)), *with United States v. Gauvin*, 173 F.3d 798, 802 (10th Cir. 1999) (holding that the term "assault" in a federal criminal statute is defined "as an attempted battery or as placing another in reasonable apprehension of a battery" unless the statute specifically provides otherwise).

Likewise, contrary to Wells's arguments, it is not plain that every completed violation of § 2241(a)(1) will also constitute a violation of § 113(a)(1). Wells argues that § 113(a)(1) is a lesser-included offense of § 2241(a)(1) because any act of force under § 2241(a)(1) will necessarily involve an assault. The only authority Wells cites to support this argument is an unpublished decision holding that a defendant's prior state-court convictions for assault and battery required a sufficient use of force under state law to qualify as violent felonies under the Armed Career Criminal Act ("ACCA"). *United States v. Harrison*, 785 F. App'x 534, 538 (10th Cir. 2019). Even assuming this unpublished decision could help

-15-

establish clear, well-settled law, Wells does not explain why this case would stand

for the proposition that any use of force necessarily involves an assault, nor does

he acknowledge the limited usefulness of *Harrison* in this context given the

difference between the proof necessary to establish § 2241(a)(1)'s force element

and the level of force necessary for a prior conviction to be defined as a violent

felony under the ACCA. *Compare United States v. Holly*, 488 F.3d 1298,

1302-03 (10th Cir. 2007) (holding that § 2241(a)(1)'s "element of force does not

require proof of actual violence" and "may be inferred by such facts as disparity

in size between victim and assailant, or disparity in coercive power" (quotation

omitted)), *with United States v. Garcia*, 877 F.3d 944, 950 (10th Cir. 2017)

("Reduced to its essence the ACCA requires violent physical force."). The

requirement of force under § 2241(a)(1) "may be satisfied by a showing of

restraint sufficient to prevent the victim from escaping the sexual conduct," and a

jury may infer force under § 2241(a)(1) based on size disparities or coercive

power dynamics, such as might exist between a sheriff and the prisoners under his

authority. *Holly*, 488 at 1403. Wells acknowledges that "'force' includes a wide

range of conduct," Well's Opening Br. at 26, but he fails to support his argument

that this entire range of conduct necessarily and obviously includes, in every

instance, an assault under § 113(a)(1), thus rendering it a lesser-included offense

of § 2241(a)(1). *See United States v. Gerhard*, 615 F.3d 7, 19 (1st Cir. 2010)

-16-

("The conduct described in one offense must *necessarily* include the conduct of the second offense to result in a double jeopardy violation."); *Benoit*, 713 F.3d at 13 ("[T]he test articulated in *Blockburger* can be met even with 'substantial overlap in the proof offered to establish the crimes.'" (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n. 17 (1975)). Moreover, he concedes that "[n]o court has applied the *Blockburger* test to § 2241(a)(1) and § 113(a)(1)." Wells's Opening Br. at 27. This state of the law "generally preclude[s] a finding of plain error." *United States v. Turrietta*, 696 F.3d 972, 981 (10th Cir. 2012). We therefore hold that Wells has not met his burden of showing a "clear or obvious [error] under current, well-settled law." *DeChristopher*, 695 F.3d at 1091.[7]

---

[7]Given that the double-jeopardy/multiplicity issue is before the court on plain error review, and given that the burden is on Wells to demonstrate the existence of a plain error, we resolve the issue on the basis of the arguments Wells has presented to the court, and we do not address any other potential issues or arguments. In particular, we note that Wells applies the *Blockburger* test to § 2241(a)(1) specifically, not to § 2241(a) as a whole. Section 2241(a) provides:

> (a) **By Force or Threat.**—Whoever, in the special maritime and territorial jurisdiction of the United States . . . knowingly causes another person to engage in a sexual act—

> > (1) by using force against that other person; or

> > (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping;

> or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

(continued...)

## ii. Vagueness[8]

Wells asserts § 113(a)(1) is unconstitutionally vague because it imposes a mental state that is impossible for a person to hold, i.e., the statute prohibits a person from specifically intending to knowingly violate § 2241.  To prevail on a preserved vagueness claim, Wells would have to show "(1) that ordinary people cannot understand what conduct the statute prohibits, and (2) that the statute does not establish minimal guidelines to govern law enforcement." *United States v. Graham*, 305 F.3d 1094, 1105 (10th Cir. 2002).  Because § 113(a)(1) does not implicate First Amendment freedoms, vagueness challenges like the one at issue here "must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975).  An appellant "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as

---

[7](...continued)
This statute might arguably be considered to set out only a single crime that can be accomplished by two different means, *see generally Mathis v. United States*, 579 U.S. 500 (2016), but Wells does not even hint at this possibility. Accordingly, he does not address how the *Blockburger* test would apply if § 2241(a) set out only a single crime.  Our resolution of his arguments should not be seen to have, sub silentio, resolved whether § 2241(a) sets out two crimes with separate elements or only one crime with alternate means.

[8]To the extent Wells's vagueness claims serve as an alternate avenue to challenge the elements instructions provided to the jury on the §§ 2241(a)(1) and 113(a)(1) convictions, those challenges are waived because Wells invited any alleged errors.  *See supra* III.A.1.

applied to the conduct of others." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).

Wells asserts as follows, without any citation to authority: "Section 113(a)(1) makes it illegal to assault another with the 'intent' to 'knowingly' cause another person to engage in a sexual act by using force against that other person. The statute on its face is incomprehensible." Wells's Opening Br. at 28. Although not entirely clear, it appears Wells is asserting that when a specific intent crime incorporates a general intent crime (or a crime with some general intent elements), the general intent elements continue to exist. *Compare* 18 U.S.C. § 113(a)(1) (criminalizing assault with the intent to violate, inter alia, § 2241), *with* 18 U.S.C. § 2241(a)(1) (criminalizing the use of force against another person to knowingly cause that person to engage in a sexual act). It is far from clear § 113(a)(1) operates in the fashion described by Wells.

In any event, this court need go no further than the facts of the case to resolve Wells's vagueness challenge. *Mazurie*, 419 U.S. at 550; *Vill. of Hoffman Ests.*, 455 U.S. at 495. Wells's assault against V.W. was prolonged, involved, and brutal. The assaultive conduct was unmistakably done with the specific intent to commit aggravated sexual abuse. For instance, during the attempted penetration with the wooden club, Wells asked V.W. if "that's how it felt" when

V.W. was with her "little boyfriend." R. Vol. VIII at 177. An ordinary person would understand such conduct was prohibited by § 113(a)(1).

For those reasons set out above, the district court did not err in failing to, sua sponte, set aside Wells's § 113(a)(1) conviction as "incomprehensible" or "impossible."

### b. Evidence Regarding V.W.'s "Risk of Death"

At trial, Dr. Rebecca Vogel testified as to the nature and extent of V.W.'s injuries. In so doing, she testified as to, inter alia, damage to V.W.'s abdominal and pelvic regions, as revealed in medical imaging. That imaging revealed "a lot of inflammation as well as some blood" in the part of the gastrointestinal system known as the duodenum. R. Vol. VIII at 512. Vogel testified the duodenum is a particularly important part of the gastrointestinal system.[9] She further noted the danger inherent in trauma to that organ, particularly identifying the difficulty of surgical intervention and, even absent the need for surgery, risk of tissue

---

[9]Vogel testified as follows:

> The duodenum is so important not only because it's the first part coming out of your stomach and into your small intestine, but it's also where your liver drains something called bile that is necessary for life, as well as the pancreas which helps you with digestive enzymes, insulin, and multiple other functions.

R. Vol. VIII at 513.

damage.[10]  As to complications flowing from surgery on the duodenum, Vogel

noted that both death and "long-standing infection" were significant possibilities.

*Id.* at 514.  Vogel testified that the percentage of morbidity associated with

trauma to the duodenum—ranging from infection to "prolonged hospitalization"—

exceeded sixty percent.  *Id.*  As to the question of mortality, Vogel testified that

simple damage to the duodenum (i.e., damage not coupled with associated

trauma), even if diagnosed and treated promptly, resulted in death in

approximately six percent of cases.  She also explained that delays in treatment

and/or duodenum injury with associated trauma significantly increased the

chances of mortality, to as much as forty percent.

---

[10]In response to a question from the prosecution regarding medical concerns associated with damage to the duodenum, Vogel testified as follows:

> One, it's an incredibly difficult area to surgically treat.  It is a large, extensive operation to be able to address injuries here.

> And, number two, when you look at the stomach, which has acid in it, which is a very low pH, that can damage tissues around it quite extensively, as well as the pancreas actually has very, um, toxic enzymes that can eat away at the tissue in that area.

> And so when you have an injury to that area, if there's a lot of fluid, it carries a very high risk of having complications or even death if misdiagnosed or not diagnosed properly.

R. Vol. VIII at 513.

On appeal, Wells asserts all of the testimony recounted above is irrelevant, and its admission improper, because V.W. never faced a risk of death.[11]   Wells has not shown the admission of Vogel's testimony was error, let alone plain error. As a general matter, relevant evidence is admissible.  *See* Fed. R. Evid. 402 (providing relevant evidence is admissible unless prohibited by the United States Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court).  To be relevant, evidence need only have "any tendency" to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401.  This standard is not intended to impose a high burden to admissibility.  *Id.* cmt. ("The standard of probability under the rule is 'more . . . probable than it would be without the evidence.'  Any more stringent requirement is unworkable and unrealistic." (alteration in original)); *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006) ("Rule 401 is a liberal standard."). "[A] fact is of consequence when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only needs to have "any

---

[11]The narrowness of Wells's challenge—one based exclusively on the question of relevance and not in any way based on Fed. R. Evid. 403—is confirmed by his reply brief.  Wells's Reply Br. at 32 (asserting the government "set up a straw man" by raising Fed. R. Evid. 403 balancing and clarifying that the argument as to Vogel's testimony was based exclusively on the claim her testimony was irrelevant).

-22-

tendency" to do so.  *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998) (quotations omitted); *see also id.* ("The rule establishes that even a minimal degree of probability—i.e., any tendency—that the asserted fact exists is sufficient to find the proffered evidence relevant." (quotation omitted)); *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007) ("The bar for admission under Rule 401 is very low." (quotation omitted)).  Notably, because our review of this issue is for plain error, Wells can only prevail by demonstrating Vogel's testimony is so obviously irrelevant that, despite his failure to object, the district court should have, sua sponte, excluded the evidence.  *See United States v. Brooks*, 736 F.3d 921, 934 (10th Cir. 2013).

The jury was instructed that to find Wells guilty, it had to find beyond a reasonable doubt, inter alia, Wells knowingly assaulted V.W. and, "as a result of the assault, [V.W.] suffered serious bodily injury."  R. Vol. I at 362; *see* 18 U.S.C. §§ 113(a)(6), 1365(h)(3).  Consistent with the provisions of § 1365(h)(3), the jury was instructed that "'serious bodily injury' means bodily injury which involves a substantial risk of death[;] extreme physical pain[;] protracted and obvious disfigurement[;] or protracted loss or impairment of the function of a bodily member, organ, or mental faculty."  R. Vol. I at 362.  Thus, the critical question is whether Vogel's testimony had "any tendency" to demonstrate V.W. suffered such an injury.  The answer to that question is "yes."

Vogel, a trauma surgeon, testified Wells's assault on V.W. (1) left V.W. with numerous traumatic injuries, including bruising, swelling, and bleeding all over her body; and (2) "a lot of inflammation as well as some blood in the area and swelling" in the duodenum. R. Vol. VIII at 512. Vogel testified that a duodenal injury without associated trauma, even if such an injury receives immediate treatment, carries a 6% risk of death. Critically, however, such injuries accompanied by associated trauma, such as that suffered by V.W., result in a 40% risk of death. Wells does not contend that a 40% chance that death will result is anything other than substantial. Thus, Vogel's testimony had a clear tendency to prove a necessary element as to Wells's guilt on the § 113(a)(6) charge and was, therefore, relevant.

To the extent Wells's brief asserts Vogel's testimony was irrelevant because none of the risks associated with his assault on V.W. ultimately came to pass, his assertion is completely lacking in supporting precedent. Indeed, our limited precedents reject the notion a criminal defendant can escape § 113(a)(6) liability merely because timely medical treatment prevents risks associated with an assault from coming to fruition. *See United States v. Whitethorne*, No. 97-2165, 1998 WL 165167, at *2 (10th Cir. April 9, 1998) (unpublished disposition cited solely for its persuasive value) ("The question whether an injury is life threatening must be viewed at the time of the injury rather than, as defendant

argues, after medical treatment.").  This court and others have employed this same

reasoning in analyzing the applicability of closely related provisions of the

Sentencing Guidelines.  *See United States v. Tindall*, 519 F.3d 1057, 1064 (10th

Cir. 2008); *see also United States v. Smith*, 461 F. App'x 647, 649 (9th Cir.

2011); *United States v. Young*, 144 F. App'x 33, 36 (11th Cir. 2005).

The district court did not err, let alone plainly err, in failing to, sua sponte,

exclude Vogel's testimony.

## B.  Challenges to Sentence

Wells asserts the district court erred in the following three particulars in

calculating his offense level for purposes of arriving at an advisory Sentencing

Guidelines range: (1) applying the "abduction" enhancement set out at U.S.S.G.

§ 2A3.1(b)(5); (2) concluding V.W. suffered life-threatening bodily injury for

purposes of U.S.S.G. § 2A3.1(b)(4); and (3) applying the enhancement set out at

U.S.S.G. § 3C1.1 for obstructing or impeding the administration of justice.  Each

of these issues raise a challenge to the procedural reasonableness of Wells's

sentence.  For instance, "[a] challenge to the application of a sentencing

enhancement tests the procedural reasonableness of a sentence, which requires,

among other things, a properly calculated Guidelines range." *United States v.*

*Cook*, 550 F.3d 1292, 1295 (10th Cir. 2008) (quotation omitted).  Likewise,

"[s]electing a sentence based on clearly erroneous facts is a procedural error." *Id.*

(quotation omitted).  When a criminal defendant challenges the procedural reasonableness of his sentence on appeal, this court reviews "a district court's legal interpretation of the Guidelines de novo and its factual findings for clear error."  *Id.* (quotation omitted).

### 1. "Abduction" Enhancement

Section 2A3.1(b)(5) of the Sentencing Guidelines provides for a four-level increase to a defendant's offense level if the victim was "abducted."  The term "abducted" is defined in the commentary to U.S.S.G. § 1B1.1: "'Abducted' means that a victim was forced to accompany an offender to a different location." U.S.S.G. § 1B1.1 cmt. n.1(a).  As an example, the Guidelines commentary notes as follows: "[A] bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction."  *Id.*  The district court denied Wells's belated objection to the application of § 2A3.1(b)(5) to the calculation of his offense level:

> [T]he defendant in his sentencing memorandum objects to the assessment of 4 offense levels under Guidelines Section 2A3.1(b)(5) for essentially abduction.  Here, this objection is not timely presented and may be overruled on that basis alone.  Substantively, the facts here indicate that the defendant forcibly dragged the victim from the precipice of the door to the house into a back bedroom for purposes of facilitating his ongoing and unrelenting physical and sexual assault not less than three times.  Controlling Tenth Circuit precedent, I cite to [*United States v. Archuleta*, 865 F.3d 1280, 1288 (10th Cir. 2017)], requires that this objection be overruled and that the offense level be increased by 4 levels for abduction under Guidelines Section 2A3.1(b)(5).

R. Vol. VIII at 762.[12]

Wells argues the district court erred in relying on *Archuleta* to support the conclusion he abducted V.W. to facilitate his sexual assault of her. Wells's argument is devoid of merit. Although *Archuleta* involved a bank robbery in which the defendant's offense level was calculated pursuant to U.S.S.G. § 2B3.1, that provision also includes a four-level enhancement "[i]f any person was abducted to facilitate commission of the offense." U.S.S.G. § 2B3.1(b)(4); *Archuleta*, 865 F.3d at 1285. Like the enhancement at issue in this case (i.e.,

---

[12]As this passage makes clear, the district court denied Wells's objection to the application of § 2A3.1(b)(5) on two independent bases: (1) he failed to file a timely objection to the applicability of that provision; and (2) his actions amounted to abduction under the interpretation of that term set out in *Archuleta*. Under Federal Rule of Criminal Procedure 32(f)(1), the parties in a criminal trial must make written objections to the Presentence Report within fourteen days. Although a district court can allow for the filing of additional objections at any time before sentencing if a party makes a showing of "good cause," Fed. R. Crim. P. 32(i)(1)(D), a review of the transcript of the sentencing hearing shows no effort on the part of Wells to make such a showing. R. Vol. VIII at 749-55. Such a set of affairs fully supports the district court's determination that Wells's objection should be rejected as untimely. *See United States v. Zubia-Torres*, 550 F.3d 1202, 1208 (10th Cir. 2008) ("Here, the defense made no objection to the PSR within the fourteen day period and did not ask the court to allow new objections after that point."). When a district court rejects a claim on two independent grounds, an appellant must challenge each ground or risk waiver of the issue generally. *Starkey v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1252 (10th Cir. 2009) ("When an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling."). Given Wells's failure to address the district court's timeliness basis for denying his objection, this court would be fully justified in summarily affirming. Because, however, it is clear Wells's challenge to the applicability of § 2A3.1(b)(5) fails on the merits, this court chooses to resolve the appeal on that basis.

§ 2A3.1(b)(5)), § 2B3.1(b)(4) draws its definition of "abducted" from the application notes to U.S.S.G. § 1B1.1.  *See* U.S.S.G. § 2B3.1 cmt. n1.  Relying on the plain meaning of the term "location" in note one to § 1B1.1, *Archuleta* held as follows: a person is "abducted" if "(1) he or she is forced to move from his or her original position with sufficient force that a reasonable person would not believe he or she was at liberty to refuse; (2) the offender accompanies the person to the new location; and (3) the relocation of the person was in order to further either the commission of the crime or the offender's escape."  865 F.3d at 1288 (equating, under a plain meaning analysis, location with position).  Given that definition, *Archuleta* held that forcing a bank teller from the bank lobby "around a corner and into a separate vault area" amounted to an abduction.  *Id.*

According to Wells, the definition of "abducted" adopted in *Archuleta* is not applicable here because that case involved robbery, while this case involves sexual assault.  The problem, of course, is that the definition of "abducted" at issue in *Archuleta* is the same definition at issue here: the one set out in § 1B1.1 cmt. n.1(A).  This court does not see how, consistent with principles of stare decisis, we could adopt a reading of "abducted" that requires more, in a contextually appropriate case, than movement from one location in a building to another.  *See United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000) ("Under the doctrine of *stare decisis,* this panel cannot overturn the decision of another

-28-

panel of this court. . . . The precedent of prior panels which this court must follow includes not only the very narrow holdings of those prior cases, but also the reasoning underlying those holdings, particularly when such reasoning articulates a point of law.")  In any event, we can perceive of no principled reason to depart from the definition of "abducted" set out in *Archuleta*.[13]  The risks of isolation due to abduction in sexual abuse cases are, most certainly, no less present than in a robbery.  *United States v. Saknikent*, 30 F.3d 1012, 1013 (8th Cir. 1994) ("Abduction increases the gravity of sexual assault or other crimes because the perpetrator's ability to isolate the victim increases the likelihood that the victim will be harmed.").

Wells claims that applying *Archuleta*'s definition of abduction in sexual assault cases involving § 2241(a)(1) will result in double-counting because any use of force, a required element of § 2241(a)(1), would cause a victim to alter

[13]We note one way in which the test for "abduction" under U.S.S.G. § 2A3.1(b)(5) could be held to differ from the three-part test articulated in *Archuleta*.  Specifically, the third element of the *Archuleta* test—"the relocation of the person was in order to further either the commission of the crime or the offender's escape," 865 F.3d at 1288—appears to be derived not from the underlying definition provided in § 1B1.1, but rather from the specific language of the robbery abduction enhancement, which applies "[i]f any person was abducted *to facilitate commission of the offense*," U.S.S.G. § 2B3.1(b)(4) (emphasis added).  Section 2A3.1(b)(5) does not contain this limiting language, but rather applies simply if "the victim was abducted."  Thus, only the first two elements of the *Archuleta* test would seem necessary to establish abduction under § 2A3.1(b)(5).  This issue has not been squarely presented in this case, however, and removing this element from the *Archuleta* definition would not benefit Wells in any event.  We accordingly do not resolve this potential issue in this appeal.

"position," no matter how trivially. *Compare* U.S.S.G. § 2A3.1(b)(1) (providing

for a four-level increase to a defendant's offense level if the "offense involved

conduct described in 18 U.S.C. § 2241(a) or (b)"),[14] *with* U.S.S.G. § 2A3.1(b)(5)

(requiring a four-level increase to a defendant's offense level if the victim was

abducted).  Wells's arguments appear to be based on the analysis set out in the

*Archuleta* dissent.  *See* 865 F.3d at 1292-95 (Seymour, J., dissenting).  The

*Archuleta* majority, on the other hand, specifically rejected the notion its

definition of "abduction" would cause necessary overlap between use-of-force

and abduction enhancements.  *Id.* at 1288 n.5; *see also United States v. Joe*, 696

F.3d 1066, 1070 (10th Cir. 2012) (holding that, in the ordinary case,

"impermissible double counting occurs when the same conduct on the part of the

defendant is used to support separate increases under separate enhancement

provisions which necessarily overlap, are indistinct, and serve identical purposes"

(quotations omitted)).  We are not entitled to disregard the holding in *Archuleta* in

favor of the rule advocated by the dissent.  *Meyers*, 200 F.3d at 720.

   In any event, the standard set out in *Archuleta* neither requires nor suggests

the absurd result posited by Wells.  In *Archuleta*, the enhancement applied to

---

[14]In *United States v. Joe*, 696 F.3d 1066, 1071-73 (10th Cir. 2012), this court concluded, at least for purposes of applying the sentencing adjustment set out in U.S.S.G. § 3A1.3, that § 2A3.1(b)(1) must be considered a use-of-force enhancement.  For those reasons set out below in footnote 15, Wells's reliance on *Joe* in support of his double-counting argument is misplaced.

movement from the lobby of a bank to the vault—one location to another. 865

F.3d at 1282. Furthermore, to satisfy the *Archuleta* test, the defendant must

accompany the victim "to the new location." *Id.* at 1288. Thus, the *Archuleta*

standard clearly requires more than trivial movement. And, to be clear, V.W.'s

movement was anything but trivial. Wells grabbed her by the hair at the precipice

of the door exiting the house, dragged her through a kitchen into a back bedroom.

He did this three times. He did so because, in Wells's words, V.W. "wasn't

leaving, and . . . he was going to kill [her]." R. Vol. VIII at 169. The abduction

and "use-of-force" enhancements in this case do not necessarily overlap.

The district court did not err when it concluded Wells abducted V.W. for

purposes of § 2A3.1(b)(5). The district court's conclusion in that regard does not

lead to any impermissible double counting with the sentencing enhancement set

out in § 2A3.1(b)(1).[15]

---

[15]Wells's reliance on *Joe* to support the notion double counting will occur if
this court uses the *Archuleta* definition of "abducted" in the context of sexual
assault crimes is entirely misplaced. As *Joe* makes clear, the double-counting
analysis employed therein is not generally applicable because it was interpreting a
Guideline provision that contained specific language precluding a particular type
of sentencing overlap. 696 F.3d at 1070 ("We note for clarification that most
cases from our court dealing with the issue of 'double counting' in the context of
sentencing enhancements employ an analysis different from the one we apply
here."); *see also* U.S.S.G. § 3A1.3 & cmt. n.2 (2009) (setting out a two-level
upward adjustment for physical restraint of the victim, but providing that the
adjustment does not apply "where the unlawful restraint of a victim is an element
of the offense itself"). In calculating Wells's total offense level, the district court
did not employ the adjustment set out in § 3A1.1. Accordingly, *Joe* simply does

(continued...)

## 2. "Permanent or Life-Threatening Bodily Harm" Enhancement

Section 2A3.1(b)(4) of the Sentencing Guidelines provides for a four-level increase in a defendant's offense level if the "victim sustained permanent or life-threatening bodily injury." The Guidelines define "permanent or life-threatening bodily injury" as, inter alia, "injury involving a substantial risk of death." U.S.S.G. § 1B1.1 cmt. n.1(K). The district court applied this enhancement in calculating Wells's total offense level.[16] Wells asserts the district court committed clear error in concluding V.W.'s injuries involved a substantial risk of death. *Cf. United States v. Perkins*, 132 F.3d 1324, 1326 (10th Cir. 1997) (holding that the "district court's determination of the significance of a bodily injury is a finding of fact we review for clear error"). Because the district court's finding is fully supported by the testimony of Vogel, a trauma surgeon and V.W.'s

---

[15](...continued)
not speak at all to the issue before the court in this case.

[16]The district court found as follows:

> At trial credible testimony demonstrated that the victim required emergency medical evacuation by airplane from Cortez, Colorado, to Lakewood, Colorado, due to the nature and extent of her serious injuries. The trauma surgeon who treated her testified that the victim had internal bleeding to her duodenum and opined that risk of death for this injury was approximately at least 20 percent, 1 in 5, and if untreated within 48 hours was 40 percent. A 20 to 40 percent risk of death, given the nature and extent of the injuries sustained by the defendant, is clearly substantial.

R. Vol. VIII at 761-62.

treating physician, the district court did not clearly err in finding that the injuries Wells visited upon V.W. resulted in life-threatening bodily injury.

Vogel's testimony is recounted above. *See supra* Section III.A.2.b. That uncontradicted testimony is more than sufficient to support the district court's finding that V.W.'s injuries carried with them a substantial risk of death. *See Tindall*, 519 F.3d at 1064 ("An undisputed statement by the treating doctor, in the absence of contrary evidence, can . . . amount to a preponderance of the evidence."). In arguing for the opposite result, Wells asserts Vogel's testimony was based on hypotheticals and contingencies that did not come to pass. The problem for Wells, however, is that the applicability of § 2A3.1(b)(4)'s four-level enhancement is "risk" based, and risk is measured at the time of the assault. *See id.* ("When we say 'life-threatening,' we do not mean 'actually resulting in loss of life.' Rather, the term 'threaten' denotes only 'the probable visitation of some evil or affliction.' *Webster's Third New International Dictionary* 2382 (2002). That the injury is ultimately cured does not answer whether the injury was 'life-threatening' when inflicted."); *Black's Law Dictionary* at 1442 (9th ed. 1990) (defining "risk" as follows: "The uncertainty of a result, happening, or loss; the chance of injury, damage, or loss; esp., the existence and extent of the possibility of harm <many feel that skydiving is not worth the risk>."). Here, the district court did not clearly err in finding that at the time of the assault—which

left V.W. bloody, unconscious, alone in a back room of the residence, with a significant injury to her duodenum—V.W. was subject to a substantial risk of death.

### 3. "Obstruction of Justice" Enhancement

The Sentencing Guidelines set out a two level-adjustment to a defendant's total offense level

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

U.S.S.G. § 3C1.1

#### a. Factual Background

The indictment against Wells issued on April 5, 2019. Wells was arrested on April 24, and the government moved for a no-contact order on April 25. A magistrate judge granted the government's request and entered a no-contact order on April 25. The no-contact order provided as follows: "[U]ntil further Order by this Court, the defendant, David Sidney Wells, **IS PROHIBITED FROM CONTACTING V.W.**, either directly or indirectly by telephone, electronic mail, mail, or by any other means, including through friends, acquaintances, and family members." R. Vol. I at 44. In a hearing on April 29, the magistrate judge advised

Wells as to the existence of the no-contact order and confirmed Wells understood both the requirements of the order and the consequences for non-compliance.

The jury found Wells guilty on all charges on February 7, 2020. Wells's sentencing hearing was set for June 8. On February 21, the government submitted a sentencing statement. The government asserted, inter alia, that a sentence of at least thirty years' imprisonment was necessary to vindicate the sentencing factors set out in 18 U.S.C. § 3353. Wells submitted a response sentencing statement on March 6. Wells's sentencing statement noted that he was without resources to pay a fine or restitution, asserted several of the sentencing enhancements relied upon by the government were not applicable, and claimed the § 3553 sentencing factors could be satisfied by giving Wells a shorter sentence than that advocated for by the government.

Thereafter, on April 6, the government moved for an order to show cause why Wells should not be held in contempt for violating the no-contact order. The motion said V.W. contacted the government and reported that she had received a letter from Wells.[17] The letter is dated February 9, which was two days after the jury returned its guilty verdicts. It had been placed in V.W.'s personal belongings at the jail in which she was currently incarcerated. In the letter, which was

---

[17]Wells has never admitted he authored this letter and insists the government has not carried its burden of proving he did so. This court need not take up this question in order to resolve this appeal.

attached to the government's motion, Wells laments how both of their lives have turned out and expresses sorrow for their children.  Consistent with the competing sentencing memoranda filed by the parties, Wells indicated he was likely to be sentenced to a thirty-year term of incarceration.  R. Vol. I at 418 ("So I guess I have to pay with the rest of my life in prison.  They gunna try & give me thirty years to life but I gunna appeal it.  So I am gunna try and call my public offender so he can start the paperwork for an appeal.").  Wells filed a response to the government's motion; he asserted his right to have criminal contempt proved beyond a reasonable doubt at a criminal trial.  In particular, Wells's response argued as follows:

> Without making any admission or waiving any of his rights to have any of the Government's accusations of contempt proven beyond a reasonable doubt, assuming *arguendo* V.W.'s receipt of a letter from the Defendant after her testimony at the jury trial, although a technical violation of the Court's Order of no contact, the substance of the letter does not invoke the furtherance of violence, coercion, retaliation, or make any attempt at intimidation or preventing V.W. from taking any action, but merely expresses overall sorrow, regret and feelings for their children.  Defendant submits that such conduct, if proven, did not bring about a substantial interference with the orderly administration of justice.

R. Vol. I at 424-25 (quotation and citation omitted).  The district court set a hearing on the government's motion for June 10, 2020, two days after the scheduled sentencing hearing.

-36-

On May 4, 2020, a United States Probation Officer submitted a presentence investigation report ("PSR"), which sought a § 3C1.1 two-level adjustment to Wells's total offense level for obstruction of justice. The basis for the obstruction adjustment was Wells's violation of the no-contact order. The PSR noted that the no-contact order prohibited direct or indirect contact by any means and that Wells stated he understood the effect of the order and the consequences for failing to comply with its dictates. With that background in place, the PSR asserted Wells's conduct fell within the parameters of § 3C1.1 for two reasons: (1) the no-contact order was comparable to the types of restraining orders set out in note 4(J) to § 3C1.1; and (2) the letter was an attempt to unlawfully influence V.W., a potential witness at sentencing, either directly or indirectly, as described in note 4(A) to § 3C1.1.

Wells filed a timely objection to this aspect of the PSR. He again invoked his right to a trial in which the allegations of contempt must be proved beyond a reasonable doubt and argued that if such a trial were held, double jeopardy principles would prevent application of the obstruction enhancement. In response, the government recognized the double jeopardy risk posed by punishing Wells twice for the same conduct—once for "obstruction of justice," and then again for contempt. It stated, however, that it would move to dismiss the contempt charge if the court were to apply the § 3C1.1 obstruction enhancement.

-37-

Wells renewed his objection to the adjustment in his final sentencing memorandum, repeating that he "only stands accused of contempt and he has made no admission." R. Vol. I at 452.

At the sentencing hearing, the government noted V.W. did not attend the sentencing proceeding. The government acknowledged "there's no way to tell what impact" the letter "may or may not have had," but argued that "the very purpose of having no contact orders in domestic violence cases, that the defendant violated by sending that letter, is to avoid any implication or suspicion of coercion." R. Vol. VIII at 758. The district court overruled Wells's objection to the obstruction adjustment, concluding as follows:

> At the time of the relevant conduct here, the defendant was subject to a no contact order which quintessentially is a restraining order in that it enjoined and restrained contact of any kind, including by correspondence, by the defendant to the victim. . . . Viewing the record as a whole, it is clear that Mr. Wells intended to exert influence and control over the victim. That is precisely the case with the letter dated February 9, 2020, regardless of how innocuous otherwise it may appear, when considered in the totality of the conduct of Mr. Wells vis-à-vis this victim. This is an effort to willfully obstruct, impede, or attempt to obstruct and impede the administration of justice.

*Id.* at 762-63. The district court offered no further factual findings regarding obstruction and did not ask the government to produce any evidence in support of the assertion Wells's intent in sending the letter to V.W. was to dissuade her from attending and/or testifying at the sentencing proceeding. After sentencing, the

government moved to withdraw its motion to show cause, and the hearing date was vacated.

### b. Analysis

Wells asserts the application of § 3C1.1's obstruction enhancement cannot be supported on either basis identified by the district court. In particular, he asserts the district court erred to the extent it concluded his violation of the no-contact order is obstruction per se because a no-contact order is analogous to the types of restraining orders set out in § 3C1.1's note 4(J). Additionally Wells asserts the district court's finding, for purposes of § 3C1.1's note 4(A), that he sent the letter to V.W. for the purpose of influencing V.W.'s potential testimony at his sentencing proceeding is not supported by a preponderance of the evidence. This court agrees with Wells's contentions and concludes that, on this record, the district court erred in adjusting Wells's offense level upward for obstruction of justice.

To the extent the district court adopted the PSR's assertion that Wells's violation of the no-contact order, standing alone, triggered application of § 3C1.1—because a no-contact order is analogous to the types of restraining orders identified in note 4(J)—the district court erred. *Cf.* R. Vol. VIII at 762-63 ("At the time of the relevant conduct here, the defendant was subject to a no contact order which quintessentially is a restraining order in that it enjoined and

restrained contact of any kind, including by correspondence, by the defendant to the victim."). The United States has not cited any precedent that supports such a per-se rule, and this court has not found any supporting case law. Instead, it appears that each court that has considered the issue has concluded that violations of no-contact orders only amount to obstruction if the violation was a willful attempt to impede the administration of justice. *See United States v. Burgess*, 22 F.4th 680, 686-87 (7th Cir. 2022); *United States v. McHenry*, 849 F.3d 699, 707 (8th Cir. 2017); *United States v. Strode*, 552 F.3d 630, 634-35 (7th Cir. 2009); *United States v. Mugan*, 441 F.3d 622, 631-32 (8th Cir. 2006).

Nor is it remotely accurate to analogize the no-contact order at issue here to the statutory restraining orders identified in note 4(J). Note 4(J) provides that a § 3C1.1 adjustment is appropriate if the defendant fails "to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p)." The identified provisions of subchapter I of chapter 13 of title 21 relate to drug abuse prevention and control. Section 853(e) provides for the issuance of various types of protective orders to preserve for criminal forfeiture assets of the drug trade. Section 853(p) authorizes an order to "the defendant to return [property subject to criminal forfeiture] to the jurisdiction of the court so that the property may be seized and forfeited." Notably, note 4(J) identifies two, narrow, due-process

laden types of restraining orders and indicates violations of these narrow provisions are the "types of conduct" to which the obstruction enhancement applies. U.S.S.G. § 3C1.1 cmt. n.4. This court simply cannot read the commentary to apply generally to all restraining orders and cannot see how the no-contact order entered by the district court in this case is analogous to the two specialized types of restraining orders identified in the body of note 4(J). Given this state of affairs, we conclude the district court erred to the extent it concluded a violation of the no-contact order amounted to obstruction because the no-contact order fell under the rubric of note 4(J).

Alternatively, the district court concluded Wells attempted to exert influence or control over V.W. for the purpose of obstructing or impeding the administration of justice. Having scrupulously examined the record in this case, this court concludes the district court clearly erred in concluding Wells's violation of the no-contact order was an attempt by Wells to influence V.W.'s testimony at the sentencing hearing or her right to obtain restitution.

Although the government speculated at the sentencing hearing that V.W.'s absence from the hearing could be related to the letter Wells sent to her in violation of the no-contact order—and speculates on appeal that Wells intended to deter V.W. from attending the hearing to prevent her from addressing the court regarding restitution and an appropriate sentence—there is no record evidence to

-41-

support these suppositions.  Indeed, at the sentencing hearing, the government stated that it did not even know if restitution was at issue in the case.  *See* R. Vol. VIII at 758 ("At this point in time we have not been able to communicate with the named victim to establish whether or not any restitution may be owed.").  There is no mention of the issue of restitution in the letter, a document the district court correctly described as "innocuous" on its face.  Furthermore, the PSR indicates Wells is penniless, cutting against the notion he was motivated to use the violation of the no-contact order to avoid paying restitution.  On this record, it would be nothing more than speculation to conclude the letter Wells sent to V.W. was intended to exert influence over her ability to obtain restitution.  *Cf. United States v. Delgado-Lopez*, 974 F.3d 1188, 1193 (10th Cir. 2020) ("A finding in a sentencing case must be based on evidence before the court, and thus in the record, and not on speculation or hypothesis." (quotation omitted)).

The record is likewise bereft of evidentiary support for a finding that Wells's letter to V.W. was an attempt to influence any testimony she might like to give as to an appropriate sentence for Wells's brutal crimes against her.  In concluding to the contrary, the district court cited the contents of the letter and the testimony at trial indicating Wells was a habitual spousal abuser.  The contents of the letter are of course relevant to the resolution of this important question.  *See Burgess*, 22 F.4th at 686-87 (holding that the substance of any

violations of a no-contact order are "helpful in evaluating whether [a defendant's] violative communications were 'threatening, intimidating, or otherwise unlawfully influencing'" (quoting U.S.S.G. § 3C1.1 cmt. n.4(a)).  As noted by the district court, however, the letter on its face is generally "innocuous."  The letter does not accuse V.W. of providing false trial testimony or suggest she would experience retaliation for her participation in Wells's prosecution.  *Cf. United States v. Gillespie*, 452 F.3d 1183, 1189 (10th Cir. 2006) (upholding obstruction enhancement where defendant attempted to send victim a letter between conviction and sentencing that stated in part:  "This letter is to thank you for the lies in your testimony against me. . . .  You will pay for every fallen comrade, Aryan women and child you have harmed. . . .  I will be avenged by the sword in that great day").  Nor does the letter even allude to the possibility that V.W. might testify at—or decline to attend—Wells's sentencing hearing.  If anything, the letter's contents indicate Wells thought a thirty-year sentence was a fait accompli.  R. Vol. I at 418 ("They gunna try & give me thirty years to life but I gunna appeal it.  So I am gunna try and call my public offender so he can start the paperwork for an appeal.").  In that regard, he bemoans how his treatment of V.W., his alcoholism, and V.W.'s perceived infidelity led to him spending the rest of his life in prison.  *See generally id.* at 418-20.  And, most importantly, the letter reflects regret that his actions likely left little chance of a relationship with his

children. *Id.* at 418 ("Dam I miss our baby's they out there by themselves. Sorry I am just feeling sad for myself I had kids but I just left them."). There is simply nothing in the letter that indicates an intention on the part of Wells to influence V.W.'s potential testimony at the upcoming sentencing hearing.

That leaves the district court's finding of obstructive intent entirely dependent on Wells's lengthy history of domestic abuse and intimidation, as that history is set out in the trial record. This court must recognize that it would be plausible for the district court to draw from that evidence an intent on the part of Wells to make V.W. feel sorry for him and feel bad about herself. The problem, however, is that there is nothing in that history to indicate Wells did so willfully for the purpose of influencing V.W.'s potential testimony at the upcoming sentencing hearing. Seemingly recognizing this evidentiary shortcoming, the government directs this court to a law review article and asserts that "a nearly universal obstacle for domestic violence cases is witness tampering." Gov't's Br. at 40. The government does not identify a source of authority which would support its request that this court adopt something like the following per se rule: any violation of a no-contact order in a case involving domestic violence amounts to obstruction, regardless of the nature or content of the violative contact. The potential adoption of such a rule seems like a matter best presented to a policy making body like the Sentencing Commission. In any event, this court must

-44-

evaluate the validity of the district court's finding based on the appellate record. And, importantly, it is the United States that carries the burden of demonstrating the applicability of the adjustment and, therefore, of building the record necessary to support its application. *See Burgess*, 22 F.4th at 687 (noting "the importance of verifying the factual basis for guidelines enhancements and adjustments"). Here, based on the appellate record, this court concludes the district court clearly erred in concluding Wells sent the letter to V.W. with the intent of influencing her testimony at the sentencing hearing. Accordingly, the district court erred in applying the § 3C1.1 adjustment in calculating Wells's total offense level.

## IV. CONCLUSION

Wells's challenges to the validity of his convictions are without merit. His convictions are, therefore, **AFFIRMED**. Although the district court did not err in applying the abduction and substantial-risk-of-death enhancements in calculating Wells's total offense level, the district court erred in applying the obstruction adjustment. Accordingly, this court **REMANDS** the matter to the district court for the narrow purpose of vacating Wells's sentence and conducting further proceedings on the § 3C1.1 obstruction enhancement consistent with this opinion.